UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-cr-117 (ECT/SGE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S OMNIBUS** |
| | ) | **RESPONSE TO DEFENDANT'S** |
| | ) | **PRETRIAL MOTIONS** |
| JUSTIN DAVID EICHORN, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and Daniel W. Bobier, Assistant United States Attorney, submits this omnibus response to the motions of the defendant, Justin Eichorn, seeking: (1) dismissal of the indictment, Dkt. 37; (2) suppression of evidence stemming from the search of Eichorn's truck, Dkt. 40; (3) disclosure of the identity of the undercover officer pictured in the sting operation's advertisements and text messages, Dkt. 36; and (4) suppression of statements by Eichorn, Dkt. 38. For the reasons discussed below, each of those motions should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendant Justin Eichorn was arrested as part of a sting operation designed to identify and apprehend people buying commercial sex from children. That investigation was undertaken by the Bloomington Police Department. Bloomington officers placed online advertisements for commercial sex and then manned the phone numbers provided in those ads. Many of those ads included variations of the same language:

cum $pend time with me […] Age: 18 I am: A woman I see: Men only. Hi I'm [fictitious name] ready to plz I do both and incall[1] only [covert law enforcement telephone number] City: Minneapolis, MN Name: [name] Location: Bloomington.

On March 11, 2025, the undercover law enforcement phone number used in those ads received text messages from a person later determined to be Eichorn. Eichorn's messages included, "Hey [fictitious name] I saw your post and [sic] chance you are still available tonight?" and later, "What's a guy gota do to get with the hottest girl online tonight."

On March 12, 2025, Eichorn again contacted that number, asking if the undercover was "available today." An undercover law enforcement officer (the "UC"[2]) responded, "hey baby i am." Eichorn replied, "Awesome where ya at and what's your rates."[3]

Later on March 12, Eichorn asked, "Qv[4] or hhr how old are you." The UC responded: "kinda nervous 2 say," and then revealed, a few texts later, "im 17 sry don't want u 2 b mad."

---

[1] The term "incall" means that clients are expected to come to the location of the female to engage in commercial sex. This industry term, and those in the following footnotes, were explained at the preliminary hearing by the testifying FBI agent.

[2] As discussed below, the text exchanges that followed spanned several days. While it would have appeared to Eichorn throughout that he was communicating with a single person, the sting's messages to Eichorn were actually sent by different officers at different times. For simplicity's sake, this brief refers to Eichorn's counterparts on that thread as "the undercover" or "the UC."

[3] Exhibit A is a transcript of this text thread that redacts the names of the undercover officers communicating with Eichorn and the photos depicting an undercover officer in states of undress. The government provided an unredacted copy to Eichorn in discovery.

[4] "Qv" refers to "quick visit" or an appointment lasting approximately 15 minutes or less.

The communications continued on March 12 and March 13, 2025. Messages sent during this time included discussion of the UC's "rates," her supposed age, and sex acts.

On March 13, after again inquiring about the UC's age, Eichorn wrote, "Ok will ya send me a naughty pic of you to show me your real?" The UC responded, "whats naughty 2 u?" Eichorn replied, "You decide." The UC sent a photo of cleavage. Eichorn continued, "Got anything with lot less clothes?"

On March 17, 2025, Eichorn again contacted the undercover law enforcement phone number. Eichorn asked, "Hey what's up are you available today?" The following interaction, in part, occurred:

UC: Hey babe

Eichorn: Hey I would still like to find a way to meet ya and both feel comfortable where ya located today and would ya be open to doing an outcall[5]

UC: I am available baby. I have a private discreet place in Bloomington. I only do outcall after the first date.

UC: Yes we could do that.....I'm sorry babe my phone has been super busy and we hadnt talked for awhile....how long are you looking to spend?

Eichorn: Qv or half hour

UC: $80qv or $120hh[6]

Eichorn: Ok and what's exactly do ya offer at that rate ?

---

[5] The term "outcall" means the commercial sex worker will travel to the client's location to provide commercial sex.
[6] The UC is conveying she charges $80 for 15 minutes or less and $120 for a half hour visit.

3

UC: FS.[7] No greek[8] and bare[9] is extra.

Eichorn: Ok how much extra?

UC: $25

Eichorn: Ok what's your address I'll see if I can get there.

The UC then reintroduced the topic of the UC's purported age:

UC: A lil younger than my ad....is that ok? I just wanna have fun and no drama babe

Eichorn: Sure I don't know what your ad says cuz I don't have it up anymore but as long as your legal age I am fine

UC: I am 17...like I said don't want any drama but wanna be upfront cause one guy got hella mad at me

Eichorn: Why was he so mad? I think age of consent is 17 when do ya turn 18?

UC: Idk lol he was a creep anyway. I don't turn 18 till December

Eichorn: It's says age of consent is 16 ...... over 18 is in a position of authority over you like a teacher or friends parent

Around this point in the communications, the UC provided Eichorn with a meet-up location. Their exchange continued, and about half an hour later, Eichorn asked the UC—again, whom Eichorn had been told was a 17-year-old girl—to send him a "sexy pic":

UC: Do you wanna cum hun? Otherwise I am gonna make different plans.

Eichorn: Yes I would like to can I have a sexy pic of you to feel comfortable coming maybe even just topless waist up is fine.

---

[7] "Full service" or sexual intercourse.

[8] "Greek" refers to anal sex.

[9] "Bare," short for "bareback," meaning sexual intercourse without prophylactic protection.

4

UC: I can give you a sexy photo but I don't do nudes…I don't wanna get my stuff spread all over the internet.

Eichorn: OK how about a pic in just your bra and underwear holding up 2 fingers

A few messages later, within about 20 minutes, the UC sent Eichorn a photo showing a female, wearing a bra and no shirt, with exposed cleavage. Part of her face was visible, and she was holding up two fingers.

The text message communications continued from there:

Eichorn: Was hoping for a more full body shot but Hot you look in your 20's

UC: Says the guy who won't send me any photos lol…awfully demanding. Sorry my photo isn't good enough. **I can assure you I am 17**. If you aren't interested…bye

Eichorn: **I am interested on the way** just trying to be comfortable.

The UC then messaged Eichorn a photo showing a map of the meet-up location. She indicated on the map where Eichorn should park. Eichorn initially parked in a different location and texted: "I am there," prompting the UC to respond: "No you aren't. I can see that spot from my apartment and there are no cars there. If you can't find a parking spot how are you gonna find my G spot?" Eichorn then drove to and parked in the designated location and got out of his truck on foot. Law enforcement saw that Eichorn, having exited his truck, was wearing a black shirt. They texted him from the UC number: "is that you walking in the black shirt?" Eichorn replied, "ya."

Having received that confirmation, marked law enforcement officers approached Eichorn, who was standing immediately next to the cabin of his truck, inside the sweep of the ajar, driver's-side door. Eichorn manipulated his phone and discarded it in his vehicle as the officers approached. They arrested him.

Bloomington PD officers on the scene searched Eichorn's truck, consistent with their Impounding Motor Vehicles Policy.[10] That search uncovered two Apple iPhones, an unopened Trojan brand condom in the driver side door, $105 cash in the driver side door handle, and $24 cash in the center console. Bloomington PD then had Eichorn's truck towed to a local impoundment lot. After that initial impounding by local authorities, and after Eichorn was charged federally, FBI took possession of the truck (given that anticipated forfeiture proceedings would occur federally). Consistent with FBI policy,[11] FBI personnel conducted their own inventory search prior to remitting the truck to the U.S. Marshals Service for federal impounding. During that search, FBI found an Apple watch in the truck.[12]

Eichorn was charged March 19 via federal complaint for attempted enticement of a minor in violation of 18 U.S.C. § 2422(b).

---

[10] That policy requires inventory searches of any impounded vehicles and specifies that impoundment will occur when any one of several conditions is present, including: the driver is arrested or when "the vehicle was involved in crimes and which are evidence or contain evidence." Ex. B, Bloomington Police Dep't Manual Patrol Procedure 306, §§ I, II.B.

[11] That policy requires inventory searches of any vehicles brought into FBI custody. Ex. C, FBI Domestic Investigations and Ops. Guide, §§ 18.6.12.4, 19.7.3.

[12] Eichorn's brief makes no mention of the Apple watch and does not obviously seek its suppression. The government notes it here for completeness.

On March 26, 2025, the Court held a preliminary hearing in this matter. The government presented exhibits and testimony from FBI Special Agent Matthew Vogel. After receiving that evidence and hearing argument from the parties, the Court found there was probable cause to believe Eichorn had attempted to entice a minor for commercial sex, in violation of 18 U.S.C. § 2442(b). The government then indicted Eichorn with that same charge on April 1.

## ARGUMENT

### I.    The Motion to Dismiss Should Be Denied

Eichorn asks the Court to dismiss the indictment due to supposed selective and vindictive prosecution. He presents, however, zero evidence that he is prosecuted because he associated with any particular party, subscribed to any particular positions, or voiced any particular views. He has no such evidence because there is no such evidence.

Lacking such evidence, he clings instead to the fact that, at the time he tried to buy sex from a minor, he was an elected official. That does not help him. People who take up the mantle of public trust do not acquire immunity for criminal conduct. His argument to the contrary should be rejected.

Ultimately, prosecutors retain "broad discretion as to whom to prosecute." *United States v. White*, 928 F.3d 734, 742 (8th Cir. 2019) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). Criminal defendants who challenge that discretion via vindictive and selective prosecution claims are held to a rigorous standard and a demanding burden. Eichorn comes nowhere close to satisfying those requirements.

**A. Eichorn Fails to Establish Vindictive Prosecution**

Prosecutors have "broad discretion … in carrying out their duty to enforce criminal statutes." *United States v. Kelley*, 152 F.3d 881, 885–86 (8th Cir. 1998). They cannot, however, design a prosecution "solely to punish a defendant for exercising a valid legal right." *Id.* Such a "vindictive" prosecution would run afoul of due process. *Id.*

Defendants seeking to prove vindictive prosecution bear a "heavy" evidentiary burden. *Id.* To satisfy that burden, a defendant must come forth with "objective evidence of the prosecutor's vindictive or improper motive." *United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015). "Absent such evidence, a defendant may, in *rare* instances, rely upon a presumption of vindictiveness," but only when "he provides sufficient evidence to show a reasonable likelihood of vindictiveness exists." *Id.* In any case, the defendant's burden is demanding: "the presumption of regularity supports … prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Chappell*, 779 F.3d 872, 880 (8th Cir. 2015) (cleaned up and citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)).

Eichorn makes two arguments for vindictiveness. Neither comes close to satisfying the heavy burden he bears to come forward with objective proof.

First, Eichorn argues his case "was motivated solely" by the government's desire to expose him to a more stringent possible sentence than he could receive in state court on state charges. Dkt. 37 at 5. That argument goes nowhere. Black letter law allows prosecutors to consider such disparities when deciding who to charge. The

Eighth Circuit has "repeatedly stated that a defendant may be subject to a harsher sentence in federal court than the sentence he would receive in state court on charges based on the same conduct without implicating his due-process rights." *United States v. Leathers*, 354 F.3d 955, 962 (8th Cir. 2004) (rejecting argument that disparity constituted evidence of impermissible motive and denying claim).

Second, Eichhorn argues the government "vindictively retaliate[d]" against him "because he is a public office holder and exercised his first amendment right to political association and hold office." Dkt. 37 at 6. But he does not argue—nor is there any evidence whatsoever to support—that he was prosecuted because he had any particular political association, much less because he made any particular statements or undertook any particular First Amendment-protected activity at all. Instead, he points to a press release from the time his charges became public, arguing that because that release stated that the government "has no tolerance for public officers" who violate federal laws meant to protect children, Eichhorn was unfairly and unconstitutionally targeted. This argument fails.

Eichhorn was not charged because he held public office. He was charged because, just like the three other people apprehended in this sting who now face federal charges, see below, Eichhorn tried to buy sex from a child. And here, as in any potential prosecution, the government is not required to ignore a would-be defendant's public role when deciding whether to charge him.

Eichorn's vindictiveness claim fails because he cannot demonstrate he exercised some constitutional right and was prosecuted specifically as punishment for doing so. This did not happen. His claim should be rejected.

## B. Eichorn Fails to Establish Selective Prosecution

As with a vindictiveness claim, a defendant claiming selective prosecution must shoulder a "demanding" burden. *United States v. Armstrong*, 517 U.S. 456, 463 (1996).

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. *Heckler v. Chaney,* 470 U.S. 821, 832 (1985). The Attorney General and United States Attorneys retain "'broad discretion" to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; see 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978).

*Id.* (cleaned up). In light of that, the Supreme Court instructs that courts should be "hesitant to examine the decision whether to prosecute." *Id.* at 1486.

> Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and

decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Id.* (cleaned up).

Criminal defendants challenging prosecutorial discretion with a selective-prosecution claim must "dispel the presumption that a prosecutor has not violated equal protection." *Id.* To do so, the defendant must present "clear evidence to the contrary." *Id.* Such defendants are obligated to show both that a prosecutorial policy "had a discriminatory effect" and that "it was motivated by a discriminatory purpose." *Id* at 1480. Or, as the Eighth Circuit more recently put it: "a selective prosecution claimant [must] show (1) that he has been singled out for prosecution while others similarly situated have not been prosecuted for similar conduct and (2) that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights." *United States v. White*, 928 F.3d 734, 743 (8th Cir. 2019) (cleaned up).

## 1. Eichorn's Prosecution Has No Discriminatory Effect

In the Eighth Circuit, a defendant fails to show discriminatory effect if others similarly situated have been prosecuted. *United States v. Leathers*, 354 F.3d 955, 963 (8th Cir. 2004), is instructive. In that firearms case, the defendant claimed he was "singled out for [federal] prosecution" because he was charged after having been convicted in state court for the same conduct. The Eighth Circuit rejected his claim upon finding that "there ha[d] been past federal prosecutions of defendants previously convicted in state court for offenses that involved the use of firearms." *Id.* at 963. Put

simply: because, historically, similarly situated defendants had been prosecuted, the defendant could not satisfy the first requirement and could not advance his claim.

Here, the federal government indicted three other individuals arrested during the Bloomington sting that ensnared Eichorn. *United States v. Cazhco-Inamagua*, No. 25-cr-128 (ECT/SGE); *United States v. Huerta-Sanchez*, No. 25-cr-129 (ECT/SGE); *United States v. Taweeleh*, No. 25-cr-139 (JMB/DTS).[13] With Eichorn, these defendants join many others like them from recent years. *See, e.g.*, *United States v. Harcrow*, 135 F.4th 636, 639 (8th Cir. 2025) (per curiam) (2422(b) prosecution for attempted enticement of a minor arising from state-run sting); *United States v. McCarthy*, No. 24-1989, 2025 WL 1096728, at *1 (8th Cir. Apr. 14, 2025) (per curiam) (same); *United States v. Neuenkirk*, No. 24-1757, 2025 WL 400027, at *1 (8th Cir. Feb. 5, 2025) (per curiam) (same); *United States v. Butler*, No. 20-3688, 2022 WL 620552, at *1 (8th Cir. Mar. 3, 2022) (per curiam) (same); *United States v. Wolff*, 796 F.3d 972, 973 (8th Cir. 2015) (per curiam) (same); *see also United States v. Rajab*, 23 F.4th 793, 795 (8th Cir. 2022) (per curiam) (same, in federally run sting).

The landscape for Eichorn's selection claim is worse even than the defendant's in *Leathers*. And like in that case, the past (and, here, contemporary) charges doom the claim. 354 F.3d at 963.

## 2. Eichorn's Prosecution Has No Discriminatory Purpose

Even if Eichorn could have established that the government had "singl[ed] him out" for prosecution, his claim still would fail at the second step because he cannot

---

[13] Eichorn acknowledges only two of these three. Dkt. 37 at 3.

show the government bore any "impermissible motive" such as "racial or religious bias or the exercise of a constitutional right." *United States v. White*, 928 F.3d 734, 744 (8th Cir. 2019) (cleaned up); *see Leathers*, 354 F.3d at 962 (second requirement cannot be satisfied unless defendant comes forward with evidence that federal prosecutors "were actuated by … impermissible motive").

Eichorn fails here just as he fails to adduce any evidence this prosecution was vindictive. His greater sentencing exposure on federal charges is no help to his claim. *Leathers*, 354 F.3d at 962. Nor is the fact that he was a public official at the time of his charged conduct. Simply put, the government bore no improper motive here, which is why Eichorn has not made any such showing. His claim should be rejected.

## II.    Eichorn's Motion to Suppress Evidence Should Be Denied

Eichorn argues officers lacked probable cause to arrest him and to search the truck he drove to the rendezvous location. He is wrong in both respects.

### A. Officers Had Probable Cause to Arrest Eichorn

"Probable cause 'is not a high bar." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. And it is judged by "a practical and common-sense standard." *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) (cleaned up).

First, Eichorn argues that officers lacked probable cause to arrest him for attempted child enticement because he lacked that offense's requisite intent. Eichorn ostensibly rests this argument on the fact that, at one point in his text discussions with the undercover officers holding themselves out as a 17-year-old girl, Eichorn

received photographs of a female undercover and told her: "you look in your 20's." *See* Dkt. 40 at 3. Eichorn relied on this statement at his preliminary hearing, too, where the Court rightly rejected his argument and found the child-enticement charge supported by probable cause.[14] Dkt. 14.

The same result should obtain here. During their text conversation, the undercover officer told Eichorn three different times that she was underage, including immediately after his comment "you look in your 20's":

> UC: Says the guy who won't send me any photos lol…awfully demanding. Sorry my photo isn't good enough. **I can assure you I am 17**. If you aren't interested…bye
>
> Eichorn: **I am interested on the way** just trying to be comfortable.

Here, the question is whether officers on the scene at the time of Eichorn's arrest had probable cause to believe he had committed a crime. They did. Minnesota law prohibits agreeing to hire someone reasonably believed to be younger than 18 but at least 16 to engage in sexual contact. Minn. Stat. 609.324, subdiv. 1(c). The arresting officers knew that Eichorn had agreed to meet the UC for commercial sex

---

[14] It is not clear if Eichorn is arguing abandonment, which his brief mentions in passing. As Eichorn acknowledges, abandonment is not available to defendants who take at least one substantial step toward the crime with the requisite intent. Dkt. 40 at 4 (citing *United States v. Young*, 613 F.3d 735, 745 (8th Cir. 2010)). He does not dispute that he took a substantial step here. Nor could he, considering he negotiated prices, traveled to the meet-up location, having equipped himself with cash and a condom, and confirmed to the undercover that he had arrived, among other acts. *E.g.*, *United States v. Rajab*, 23 F.4th 793, 797 (8th Cir. 2022) (in 2242(b) prosecution, substantial step requirement satisfied where defendant "arranged to meet [the supposed minor] at a local park and traveled to the park while equipped with condoms suitable for use in sexual activity"). And as discussed herein, law enforcement had more than probable cause to believe Eichorn acted with criminal intent. If Eichorn does mean to invoke abandonment as a defense, it fails.

and that he had been told three times before driving to the agreed-upon meet up that she was 17 years old. That more than provided probable cause to arrest.

Second, Eichorn argues officers lacked probable cause because, he says, he shut off his phone prior to the arrest, which "prevented the agents from sending the confirmatory text which was for the purpose of initiating the arrest." Dkt. 40 at 4. This assertion mistakes how the sting worked. This "confirmatory text" played no role in whether officers could "initiat[e] the arrest."

Here is how it worked. When officers working the sting decided to close in on and arrest a suspect, they would at the same time send a text message of three letters. (In Eichorn's case, "MAA.") In some instances, the arresting officers would see that text come in, or see a notification of it having just come in, on a phone found on the suspect. When that happened, it would serve as further confirmation to law enforcement that that particular phone was the one the suspect had been using to text the UC. To be clear, however, officers did not plan only to arrest individuals found bearing phones that received those texts, nor, here, would reasonable officers on the scene have lacked probable cause to arrest Eichorn without having seen that he received it.

This argument is a red herring. It should be rejected.

## B. The Search of Eichorn's Truck Was Lawful

Eichorn objects to the search of the truck he drove to the rendezvous site. That search, however, was authorized on three different, individually sufficient constitutional grounds.

15

### 1.  The Automobile Exception Applied and Authorized the Search

Generally, law enforcement cannot search without a warrant premises in which the owner has a reasonable expectation of privacy. That warrant requirement does not apply, however, to car searches where, "at the time of the search, [officers] have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *United States v. Brown*, 550 F.3d 724, 727 (8th Cir. 2008). Searches conducted pursuant to this automobile exception "may lawfully reach 'places in which there is probable cause to believe that [evidence] may be found,' including containers discovered within the automobile." *United States v. Farrington*, 42 F.4th 895, 899 (8th Cir. 2022) (quoting *California v. Acevedo*, 500 U.S. 565, 579-80 (1991)); *accord United States v. Winarske*, 715 F.3d 1063, 1068 (8th Cir. 2013) (applying automobile exception).

The automobile exception applies here. Officers searched Eichorn's truck only after: (i) officers observed Eichorn drive himself in that truck to the parking lot identified by the undercovers posing as a minor (and, to be clear, Eichorn did navigate to the specific part of the lot to which the undercovers directed him via text); (ii) Eichorn confirmed to law enforcement—in the same text message thread Eichorn had used to arrange, negotiate, and solicit paid sex from a self-described minor—that he was the man law enforcement observed in the parking lot, near the truck, "walking in the black shirt"; (iii) as law enforcement approached and announced themselves to Eichorn, they saw him manipulate his phone and place it into the truck.

16

Based on these facts, a reasonable officer in those officers' shoes could believe a "fair probability" existed that "contraband or evidence of a crime"—in particular, a phone used in the attempted enticement of a minor[15]—would be found in Eichorn's truck. *United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021).

The automobile exception authorized law enforcement to search the entire truck, as well as its compartments and any containers within. *Farrington*, 42 F.4th at 899. Eichorn's suppression motion should be denied.

### 2. The Search Was Permitted Incident to Eichorn's Arrest

The suppression inquiry ends with the automobile exception. But even if the exception didn't apply here, law enforcement still was authorized to search the truck incident to Eichorn's arrest.

When police arrest a recent occupant of a vehicle, they may search the passenger compartment—and any containers found within—when it is reasonable to believe that evidence might be found in the vehicle. *See United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013); *United States v. Gordon*, 741 F.3d 872, 877 (8th Cir. 2013) (search of compartment under driver's seat valid as incident to arrest). This is true "[e]ven after [the] arrestee has been secured in the back of a police car[.]" *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013) (cleaned up).

---

[15] To say nothing of other likely evidence or instrumentalities of criminal enticement, like cash (to pay for the negotiated sex acts) and condoms (for use in the negotiated sex acts). *See United States v. Engler*, 521 F.3d 965, 971 (8th Cir. 2008) (probable cause inquiry is made based on totality of the circumstances and is judged using a common-sense approach).

Such is the case here. For the reasons discussed above, it was reasonable for officers at the time of Eichorn's arrest to believe his truck might contain evidence— not least because they saw him place his phone in that truck in the moments before he was handcuffed. Even if for no other reason, officers were authorized to search all the places where the challenged evidence was found.

### 3. Law Enforcement Conducted Reasonable Inventory Searches, and the Inevitability of the Inventory Search Dooms Eichorn's Request for Suppression in All Events

Finally, even if for no other reason, the truck search here was permissible as an inventory search. Moreover, because an inventory search was the necessary result of Bloomington PD following their Impounding Motors Vehicles policy, the discovery of the challenged evidence from such search was inevitable.

Inventory searches are one of the "well-defined exceptions" to the Fourth Amendment's warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). They permit law enforcement "to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search." *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). Inventory searches may occur prior to towing and impoundment, *United States v. Pappas*, 452 F.3d 767, 771 (8th Cir. 2006), and after, *United States v. Porter*, 859 F.2d 83, 85 (8th Cir. 1988).

Inventory searches need only be "reasonable," when judged by the totality of the circumstances, *United States v. Morris*, 995 F.3d 665, 668-69 (8th Cir. 2021), and "inventory searches are reasonable when they are conducted according to standardized police procedures," *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th

Cir. 1998).[16] When law enforcement officers conduct an inventory search pursuant to such standardized procedures, "they may keep their eyes open for potentially incriminating items that they might discover in the course of [the] search, as long as their *sole* purpose is not to investigate a crime." *United States v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015).

Those criteria are met here. Bloomington PD's written policy requires an inventory search when a vehicle's owner is arrested. Ex. B, §§ I, II.B. Bloomington officers followed that policy here by conducting an inventory search of Eichorn's truck upon his arrest. *See id.*; *cf. United States v. Martin*, 982 F.2d 1236, 1240 (8th Cir. 1993) (approving inventory search and stating that "[p]olice may take protective custody of a vehicle when they have arrested its occupants").

As described above, the FBI conducted its own inventory search later, when FBI agents took Eichorn's truck into federal custody from the local impound lot to which Bloomington PD had towed it. That search, too, complied with standardized procedures. Ex. C, FBI Domestic Investigations and Ops. Guide, §§ 18.6.12.4, 19.7.3 (policy mandating inventory searches for any vehicles brought into FBI custody). Eichorn might object that the FBI policy—unlike the Bloomington PD policy—directs agents to obtain a warrant if they have probable cause to believe an inventory search would yield evidence. *Compare* Ex. C, § 18.6.12.4, *with* Ex. B. But FBI's search occurred after the earlier search, by Bloomington, had already uncovered Eichorn's

---

[16] However, even when an inventory search does not comply with established procedures, the search still may be constitutionally reasonable. *Mayfield*, 161 F.3d at 1145 (collecting cases).

phones, cash, and condom—all seized as evidence by Bloomington as suspected instrumentalities. FBI undertook its search to comply with policy and empty the truck of all non-evidentiary items,[17] but agents had no reason to believe that possible evidence of the crime still existed in the truck and had escaped Bloomington's notice. The FBI inventory search adhered to established FBI policy, was reasonable, and thus provides no grounds for suppression. *Mayfield*, 161 F.3d at 1145.

And as for inevitability: where the government "can establish by a preponderance of the evidence that [challenged evidence] ultimately or inevitably would have been discovered by lawful means," the evidence should not be suppressed. *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). For this exception to apply the government must show (1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation.[18] *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997). Where the source of the inevitable discovery is a reasonably conducted inventory search, that search qualifies as the substantial, alternative line of investigation. *See, e.g.*, *United States v. White*, No. 22-CR-0262 (JNE/JFD), 2023 WL 3016913, at *5 (D. Minn. Feb. 9, 2023) (finding as

---

[17] The inventory search removed several obviously non-evidentiary items from the truck, like a large cooler, a phone charger, and pocket change. Law enforcement provided those items to Eichorn's counsel.

[18] Many Eighth Circuit decisions have eschewed this second requirement. *United States v. Baez*, 983 F.3d 1029, 1039 (8th Cir. 2020) (collecting cases).

much), *report and recommendation adopted*, 2023 WL 2976033 (Apr. 17, 2023); *United States v. Dunkley*, No. 22CR3393WMWDJF, 2023 WL 9289100, at *4 (D. Minn. Nov. 20, 2023) (same), *report and recommendation adopted*, , 2024 WL 185224 (Jan. 17, 2024).

So, here, even if Eichorn could identify constitutional defects in those grounds authorizing the challenged searches, his suppression argument would still fail in light of law enforcement's inevitable lawful discovery of the challenged evidence.

### 4. Eichorn's *Wong Sun* Argument Should Be Rejected

Eichorn asserts that "the search of [his] vehicle is the fruit of his illegal arrest." Dkt. 40 at 7 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). But for the reasons discussed above, his arrest was lawful. This defeats his *Wong Sun* argument.

### III. Eichorn's Motion for Disclosure of the Identity of the Undercover Officer Pictured in the Sting's Photographs Should Be Denied

Eichorn moves for an order compelling the government to disclose the identity of the undercover officer who posed for the photos used in the sting operation's online advertisements for commercial sex. Dkt. 36. He maintains her "identity, position with the police department or agency she works for, and her true age" are all "relevant and material" to whether Eichorn believed that individual was a minor. Dkt. 36 at 2. From this premise, Eichorn insists his requested information is *Brady* material that must be disclosed. He is wrong.

The government must prove in this case that Eichorn believed the individual he arranged to meet for commercial sex was under the age of eighteen. 18 U.S.C. § 2422(b). The facts relevant to that inquiry begin and end with what Eichorn knew

from March 11 to 17: the seven-day period during which he saw the sting's photos, contacted the ad's number to initiate a conversation, was advised three times that the person he was speaking with was underage, negotiated prices for specific sex acts, and drove, equipped with cash and condom, to meet her. Facts Eichorn did not know in those seven days are not relevant. He did not know then her "true age." If he had, the government would not have charged him with this crime. On this narrow issue, such information—which he could only learn now, post-charge—cannot in any way be favorable evidence "material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83 (1963).

In the same vein, Eichorn says he needs the undercover's identifying information to be able to subpoena her to testify. Dkt. 36 at 3. He is not entitled to that, either. The undercover posing for those photos did not design the sting. She did not draft the text messages sent from the sting to Eichorn. She did not speak with Eichorn. She did not participate in Eichorn's arrest. She did not search his truck. She was not even present at the scene. Her sole contribution to Eichorn's case was to pose for the photos. Eichorn may wish to showcase her to the jury and invite them, expressly or otherwise, to judge whether they believe she looks younger than 18. But again, what that officer looks like in Court, at home, or in any presentations other than the photographs Eichorn had access to in March 2025 simply are not relevant to the jury's inquiry whether, *at the time and based on the information then available to him*, Eichorn believed her to be a minor.

Eichorn's request for discovery fails to identify anything that is "material either to guilt to punishment," and that request accordingly should be denied.

## IV.    Eichorn's Motion to Suppress Statements Should Be Denied

Eichorn moves to suppress "statements made to Bloomington police officers following his arrest" and "any and all statements made during his transport to the Bloomington Police Department or the Hennepin County jail." Dkt. 38 at 1. Because those statements did not arise from any custodial interrogation, Eichorn's motion should be denied.

Questions that do not "constitute[] interrogation" do not require *Miranda* warnings. *United States v. Tapia-Rodriguez*, 968 F.3d 891, 897 (8th Cir. 2020). As such, when non-*Mirandized* suspects provide answers in response to non-interrogative questions, suppression is not appropriate. *Id.*

"Interrogation" occurs only when a law enforcement officer engages in "either express questioning or its functional equivalent," meaning "words or actions … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). However, the Supreme Court has held that those questions or actions by law enforcement "normally attendant to arrest and custody" do not quality as interrogation. *Innis*, 446 U.S. at 300–01. That makes permissible "asking about the presence of weapons in connection with a body search." *United States v. Williams-Bey*, No. 19-CR-179 (WMW/HB), 2019 WL 7882107, at *3 (D. Minn. Nov. 19, 2019), *report and recommendation adopted*, 2020 WL 114173 (Jan. 10, 2020). It also makes permissible requests for "routine information necessary for basic identification

23

purposes" and other questions "reasonably related to the police's administrative concerns," so long as a reasonable officer would not believe the information sought was "directly relevant to the substantive offense." *Tapia-Rodriguez*, 968 F.3d at 896 (request for suspect's name not directly relevant to substantive offense). Relatedly, "[v]olunteered statements of any kind" are per se not the product of police interrogation and thus "are not barred by the Fifth Amendment." *United States v. Jackson*, 852 F.3d 764, 771 (8th Cir. 2017) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478 (1966)).

No interrogation occurred here.

As officers handcuffed Eichorn, one asked if he had any weapons on him. (He replied: "I don't. Just keys in my left pocket."). That question is not interrogative, but the "quintessential example of a question normally attendant upon arrest and custody." *Williams-Bey*, 2019 WL 7882107 (concluding such questions are also permitted by *Miranda*'s public-safety exception).

After officers placed Eichorn in a squad car, one asked him whether he "ha[d] an ID in your car." (He replied that he did.) But asking for his identification (that officer had frisked Eichorn already and so knew his ID was not on his person) is also normally attendant to arrest. *See Tapia-Rodriguez*, 968 F.3d at 896.

Finally, during Eichorn's transport in the squad car away from the site of his arrest, the sole officer in the car did not ask Eichorn anything. Eichorn, however, repeatedly initiated conversation—though on non-substantive subjects, like asking for the window to be lowered (the officer complied), asking how long she had worked

as an officer ("coming up on nine years"), and asking whether she enjoys it ("it's got its moments"). None of Eichorn's questions in those exchanges have any evidentiary value to either side, but to the extent Eichorn seeks their suppression, his request should be denied because his statements in that exchange were all volunteered. *See Jackson*, 852 F.3d at 771.

## CONCLUSION

For the reasons stated above, the government respectfully requests that each of the defendant's motions be denied.

Dated:  July 11, 2025                    Respectfully submitted,

                                         JOSEPH H. THOMPSON
                                         Acting United States Attorney

                                         */s/ Daniel W. Bobier*

                                         BY:  DANIEL W. BOBIER
                                         Assistant United States Attorney

25